**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

**UNITED STATES OF AMERICA**                                                              **PLAINTIFF**

**v.**                                    **Case No. 4:21-cr-00275 KGB**

**JAMES NICHOLS, SR.**                                                                      **DEFENDANT**

**ORDER**

Before the Court is defendant James Nichols, Sr.'s motion to dismiss all charges (Dkt. No.

23). The government responded to the motion (Dkt. No. 27). The Court conducted a hearing on

the motion (Dkt. No. 35). For the following reasons, the Court denies the motion (Dkt. No. 23).

**I.      Overview Of Arguments**

Mr. Nichols was charged by indictment in Count 1 with felon in possession of a firearm

pursuant to 18 U.S.C. § 922(g)(1); in Count 2 with knowingly and intentionally possessing with

intent to distribute a mixture and substance containing a detectable amount of cocaine, a Schedule

II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); in Count 3 with

knowingly and intentionally possessing with intent to distribute less than 50 kilograms of

marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(D); and in Count 4 with knowingly

and intentionally possessing a firearm in furtherance of a drug trafficking crime in violation of 21

U.S.C. § 841(a)(1) and 18 U.S.C. § 924(c)(1)(A) (Dkt. No. 1). The indictment also includes

forfeiture allegations (*Id.*). Certain evidence leading to Mr. Nichols's indictment was obtained

through a search conducted at 7117 North Chicot Road, Apartment 6 ("Apartment 6").

Mr. Nichols filed what he titles a motion to dismiss all charges, which this Court construes

as a motion to suppress evidence seized from Apartment 6 (Dkt. No. 23).[1] Mr. Nichols maintains

---

[1] The government in its response in opposition to Mr. Nichols's motion contends that the
motion is "more properly characterized as a motion to suppress." (Dkt. No. 27, at 1 n.1). At the

that he was charged based on "evidence illegally seized during the warrantless search of his workplace in direct violation of Fourth Amendment protection from unreasonable searches and seizures." (*Id.*, ¶ 3). He argues that law enforcement "lacked the required probable cause to conduct a warrantless search of his workplace, which would have otherwise required a signed warrant by a Judge or Magistrate." (*Id.*, ¶ 4). He also argues that "[l]aw enforcement failed to get the owner's permission and conducted the warrant in an unreasonable manner considering that the warrant did not extend to Mr. Nichols's workplace." (*Id.*, ¶ 5). Mr. Nichols acknowledges that he had "a valid warrantless search waiver on file" but contends that this does not apply to his place of work, "[o]nly his person, vehicle, or residence." (*Id.*, ¶ 7).

In its response, the government argues that Mr. Nichols lacks standing to challenge the search of Apartment 6 (Dkt. No. 27, at 5–7). In the alternative, if this Court determines that Mr. Nichols has standing to challenge the search of Apartment 6, the government argues that this Court should find the search did not violate Mr. Nichols's Fourth Amendment rights because the search was conducted based on probable cause and a valid warrant (*Id.*, at 7–10). The government also contends that, if Mr. Nichols used Apartment 6 as a dwelling, the search was valid based on Mr. Nichols's valid search waiver on file (*Id.*, at 10–12). In the further alternative, the government asserts that, even if the search warrant was deficient and that the warrantless search waiver was inapplicable, the Court should deny Mr. Nichols's motion because law enforcement acted in good faith reliance on the warrant issued (*Id.*, at 12–15).

---

hearing, the Court raised this issue with the parties (Dkt. No. 35). Counsel for Mr. Nichols acknowledged that the relief sought in the instant motion is the suppression of evidence, and he stated that he would defer to the Court as to how the motion is construed.

## II.     Factual Background

The Court conducted a hearing on Mr. Nichols's motion (Dkt. No. 35).  At that hearing, several witnesses testified, including Detective Dalton Schisler of the Little Rock Police Department, Street Narcotics Unit, who also works with the Drug Enforcement Agency; Brenda Jackson, who through her company BSD Investment Properties, owns Apartment 6 and employed Mr. Nichols; and Mr. Nichols.  The Court makes the following factual determinations based on evidence presented.

Detective Schisler testified that, in 2021, a reliable cooperating individual contacted him with information that Mr. Nichols was selling narcotics, specifically cocaine and marijuana, from Apartment 6.  Detective Schisler and the cooperating individual drove to Apartment 6 and located a black Acura driven by Mr. Nichols.  The cooperating individual explained that Mr. Nichols was using Apartment 6 as a "trap house," meaning a place to store narcotics and from which Mr. Nichols sold narcotics.

At that time, Detective Schisler knew that Mr. Nichols was on parole with the State of Arkansas; that Mr. Nichols had on file a valid warrantless search waiver as a condition of his parole; and that Mr. Nichols had on an ankle monitor providing real-time data of his location. During the course of his month-long investigation from June to July 2021 into the activities of Mr. Nichols, Detective Schisler observed Mr. Nichols for 10 to 20 hours at various times during the day and night, and Detective Shisler obtained information from Arkansas Community Corrections on the digital ping of Mr. Nichols's ankle monitor.  That information established that Mr. Nichols was at Apartment 6 over 100 times during the investigation and that Apartment 6 was the most frequent location pinged by Mr. Nichols's ankle monitor.  Detective Schisler also learned that Mr.

Nichols listed with Arkansas Community Corrections the address of Apartment 6 as his place of employment, while listing a different physical address as his residence.

Detective Shisler explained that, when the digital ping indicated Mr. Nichols was at Apartment 6, Detective Shisler went there and watched Mr. Nichols, specifically watching for behaviors consistent with employment and behaviors that would corroborate information provided by the cooperating individual.  Detective Shisler testified that, based on his observations, Mr. Nichols did not keep a regular schedule when traveling to or staying at Apartment 6, and he never observed Mr. Nichols do any type of maintenance work or groundskeeping around the area that would relate him to be employed there.  Detective Shisler testified that he observed Mr. Nichols on multiple occasions use keys to unlock a security door and the front door of Apartment 6; he also observed several individuals come to the location in most instances by driving a car, pulling in front of Apartment 6, going to the door of Apartment 6, and then knocking on the door of Apartment 6.  According to Detective Shisler, if Mr. Nichols was at Apartment 6, he answered the door, greeted the individual, and permitted the individual to enter Apartment 6 where the individual stayed a short period of time and then left.  Detective Shisler testified that, based on his training and experience, this activity was consistent with drug activity.

Detective Shisler explained that he did not try to obtain a lease agreement for Apartment 6 before Mr. Nichols's arrest.  According to Detective Shisler, through his experience, he understood that the owners of Apartment 6 might not cooperate with law enforcement and, in fact, might inform the individual under investigation of the inquiry so as to jeopardize the investigation.

Detective Shisler testified that, on July 7, 2021, the plan was for Arkansas Community Corrections agents to meet Detective Shisler at Apartment 6 and for all to approach Mr. Nichols and Apartment 6.   However, Mr. Nichols left Apartment 6 before Arkansas Community

Corrections agents arrived at the location.  One agent remained at Apartment 6, even after Mr. Nichols left, to ensure that no other individual went in or out of Apartment 6 during the relevant time period that day.

Arkansas Community Corrections agents made contact with Mr. Nichols in the black Acura and searched the vehicle pursuant to the warrantless search waiver.  The agents found marijuana and then detained Mr. Nichols and his passenger.  Two keys to Apartment 6 were located on Mr. Nichols's person at the time of his arrest.  Mr. Nichols was detained in Ms. Jackson's driveway, approximately 15 minutes from Apartment 6.  Ms. Jackson owns BSD Investment Properties, which owns two buildings of 11 apartments in total, including Apartment 6.  Ms. Jackson testified that no one asked her permission to search Apartment 6 but that she would have consented to a search of Apartment 6, if asked.

Instead, according to Detective Shisler, Arkansas Community Corrections agents took the keys that Mr. Nichols had on his person and returned to Apartment 6 where agents used the keys to enter Apartment 6 and perform a compliance check.  Detective Shisler testified that law enforcement believed they had sufficient probable cause that Mr. Nichols was using Apartment 6 as a secondary residence to permit entry into Apartment 6.  He also testified that later that day Mr. Nichols provided a written statement claiming the marijuana located in the black Acura was his.

According to Detective Shisler, agents who entered Apartment 6 immediately observed in plain view drug paraphernalia, a firearm, and suspected narcotics and then conducted a security sweep, securing Apartment 6 for a search warrant to be obtained.  Detective Shisler then completed the application for a search warrant for Apartment 6.  After a judge signed the search warrant, law enforcement searched Apartment 6.  Detective Shisler participated in the search of Apartment 6 and took pictures (*see* Gov. Ex. 1-4).

Detective Shisler testified that he observed a bed, suitcases, a working TV, couch, furniture, and tables in Apartment 6. There were tennis shoes and clothes in the closet. There were paper towels, Clorox wipes, frying pans, dishes, and utensils in kitchen. Detective Shisler did not believe it looked like a staged apartment used for showing customers what a typical apartment might look like but instead appeared occupied by someone who was using it for their own purposes. During the search of Apartment 6, law enforcement located a large bag of approximately 200 grams of marijuana, a Colt 1911 handgun loaded with five live .45-caliber rounds, a bag of 8 grams of suspected and field-tested cocaine, and narcotics-related paraphernalia, such as working digital scales, plastic bags, a vacuum sealer, and 12-gauge ammunition.

At the hearing, Ms. Jackson confirmed that she employed Mr. Nichols to assist her with the apartments. Ms. Jackson testified that she was aware that Mr. Nichols also had a car wash operation that he may have conducted on site at the apartments. She testified that she and Mr. Nichols had keys to Apartment 6 and that sometimes the maintenance workers or others working at the apartments had keys to Apartment 6. She clarified that Mr. Nichols did not perform maintenance at the apartments but instead did other tasks for her, like collecting rent, buying supplies, and posting notices. Ms. Jackson explained that Mr. Nichols did not have set work hours.

Ms. Jackson also explained that, at some time during Mr. Nichols's employment, Apartment 6 was set up as a model apartment for people to see if they wanted to rent an apartment and to pick up an application. There was a bedroom set up, a living room set up, and card tables set up for business, according to Ms. Jackson.

According to Mr. Nichols, Apartment 6 was labeled "office." Mr. Nichols testified that for some time, along with being set up as a model apartment, Apartment 6 was used essentially as a storage room to store paint, doorknobs, and other materials to fix up and work on the other

apartments.  According to Mr. Nichols, the day of his arrest, multiple people were in and out of Apartment 6 that morning, and he was not the last one to leave Apartment 6 before his arrest.  He claims other people were still in Apartment 6 when he left Apartment 6 before his arrest.

Mr. Nichols also testified that his younger sister lived in Apartment 5.  He went to her apartment many mornings to give her a ride to work and then returned for his work.  Mr. Nichols also had a friend who lived in Apartment 9 whom he visited, and Mr. Nichols claims he knew many if not all of the tenants in the apartments.

Ms. Jackson testified that, at some point, she learned Mr. Nichols was permitting his son to stay in Apartment 6, and she changed the locks when she found out because it was unacceptable to her.  Mr. Nichols explained that he served 18 years on a prior charge and his son was not born when Mr. Nichols went into custody previously; when Mr. Nichols was released from prison, his son was 18 years old.  Mr. Nichols also explained that during the time of the events giving rise to this case, his son was pursuing a career as a rapper.  According to Mr. Nichols, his son could not stay with him because his son had guns that his son possessed lawfully but that Mr. Nichols could not be around.  Instead, Mr. Nichols testified that he permitted his son to stay in Apartment 6 after Mr. Nichols left for the day because, according to Mr. Nichols, his son was not in town a lot at first and because his son had nowhere else to go.

Mr. Nichols testified that at some point on or around Father's Day, Ms. Jackson called Mr. Nichols, said tenants at the apartments had called police because of something going on in Apartment 6, and told Mr. Nichols to put out his son from Apartment 6.  However, Mr. Nichols also testified that, even after Ms. Jackson told Mr. Nichols it was unacceptable for his son to stay in Apartment 6 and changed the locks to Apartment 6, Mr. Nichols permitted his son to stay in Apartment 6 against Ms. Jackson's wishes.  Mr. Nichols testified that many times he would leave

the door to Apartment 6 unlocked for his son to access.  Mr. Nichols acknowledged that his son permitted his friends in Apartment 6, as well, based on videos his son made and about which Mr. Nichols learned later.  Mr. Nichols testified that his son "basically" lived in Apartment 6 but was not paying rent.

### III.    Analysis

The defendant moving to suppress has the burden of demonstrating a legitimate, reasonable, expectation of privacy in the place searched.  *United States v. Russell*, 847 F.3d 616, 618 (8th Cir. 2017) (citing *Rakas v. Illinois*, 439 U.S. 128, 148–144 (1978)).  To determine whether the defendant has a legitimate, reasonable expectation of privacy, the Court conducts a two-part inquiry, assessing:  (1) whether the defendant has asserted a subjective expectation of privacy, which is a question of fact; and (2) whether the defendant's subjective expectation is objectively reasonable, which raises a question of law.  *United States v. Welliver*, 976 F.2d 1148, 1151 (8th Cir. 1992), *cert. denied*, 507 U.S. 1004 (1993); *see also United States v. Dickson*, 58 F.3d 1258, 1264 (8th Cir. 1995).  "Factors relevant to the determination of standing include ownership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the search; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case."  *United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994) (applying these factors to a vehicle search and citing *United States v. Sanchez*, 943 F.2d 110, 113 (1st Cir.1991), which also involved a vehicle search); *see also United States v. Stallings*, 28 F.3d 58, 61 (8th Cir.1994) (applying these factors to the search of a tote bag).  In sum, "[i]f a defendant fails to prove a sufficiently close connection to the relevant places or objects searched he has no standing to claim that they were searched or seized."  *Gomez*, 16

F.3d at 256; *see also United States v. Muhammad*, 58 F.3d 353, 355 (8th Cir. 1994) (applying these factors to a rental car search when rental car was leased in another's name).

Ankle monitor data supports that Mr. Nichols did not stay the night at Apartment 6, and documents on file with Arkansas Community Corrections evidence some support for the assertion that, regardless of whether Mr. Nichols operated with Apartment 6 as his *de facto* residence or trap house, Mr. Nichols maintained another residence.

Mr. Nichols contends that Apartment 6 was his place of work and that the search violated his Fourth Amendment rights as a result of his expectation of privacy in his place of work.  The Court determines that, even if Apartment 6 was Mr. Nichols's place of work, his privacy in and control over the area was limited.

It is undisputed that Mr. Nichols did not own Apartment 6.  Further, neither Mr. Nichols nor his son leased Apartment 6.  Mr. Nichols claims that his son and his son's friends "used the apartment office from time to time overnight," and that "several people had access to the show apartment during the day and night. . . ." (Dkt. No. 24, at 4).  Mr. Nichols testified that he would leave Apartment 6 unlocked for his son.  Mr. Nichols also admitted that his son essentially lived in Apartment 6 without paying rent and against Ms. Jackson's wishes.

Moreover, Mr. Nichols admitted in his testimony that he lacked exclusive use of Apartment 6, and the record evidence before the Court supports his admission.  Along with his son's use of Apartment 6, Mr. Nichols confirmed that several other people passed through Apartment 6 on a daily basis, some with keys to access Apartment 6 and some without keys.  Evidence supports that historical use of Apartment 6 as approved by Ms. Jackson was as a model apartment and storage room.  According to the testimony of Ms. Jackson and Mr. Nichols, interested individuals moved in and out of Apartment 6 to see a model apartment and to pick up applications.  Maintenance

workers and other third parties performing work at the apartments had access to Apartment 6 and in some cases keys to Apartment 6, given that items necessary for their work were stored in Apartment 6.  On a regular basis, Mr. Nichols was responsible for performing tasks outside of Apartment 6, such as delivering rent checks to Ms. Jackson and running miscellaneous errands for the apartments, according to the testimony of Ms. Jackson and Mr. Nichols.  Mr. Nichols in his motion and brief in support also characterizes Apartment 6 as his workplace where "numerous people c[a]me in and out with access to it daily." (Dkt. No. 24, at 4).  Based on this evidence, the Court finds that Mr. Nichols had limited ability, if any ability, to regulate access to Apartment 6.

Even if Mr. Nichols had a subjective expectation of privacy in Apartment 6 as his workplace, that expectation of privacy was not objectively reasonable based on the specific facts of this case.

### IV.    Conclusion

For these reasons, the Court concludes that Mr. Nichols lack standing to challenge the search of Apartment 6 and denies his motion (Dkt. No. 23).

So ordered this 10th day of May, 2023.

Kristine G. Baker
United States District Judge